UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

CHAUN SINER,

                  Plaintiff,              Civil Action No. 14-12578
                                                        Honorable George C. Steeh
           v.                                Magistrate Judge David R. Grand

SCOTT GOINGS,
STEVEN SCARPINO,
AND JACKSON CITY
POLICE DEPARTMENT

                  Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [20]

Before the court is Defendants' motion for summary judgment [20]. An Order of Reference was entered on August 7, 2014, referring all pretrial matters to the undersigned pursuant to 28 U.S.C. § 636(b). [9]. Having reviewed the pleadings and other papers on file, the Court finds that the facts and legal issues are adequately presented in the parties' briefs and on the record, and it declines to order a hearing at this time.

**I.    RECOMMENDATION**

For the reasons set forth below, the Court RECOMMENDS that Defendants Steven Scarpino, Scott Goings, and Jackson City Police Department's Motion for Summary Judgment [20] be GRANTED.

**II.    REPORT**

    **A.    Procedural Background**

Plaintiff Chaun Siner ("Siner") brings this action pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the Fourth, Sixth, and Fourteenth Amendments to the United States

1

Constitution. [1 at §III *Statement of Claims*]. Siner, is currently incarcerated at the Carson City Correctional Facility after having pled guilty to narcotics distribution charges related to the events described herein. [*Id.*; 1 at 46]. Siner alleges that during his arrest in Jackson, Michigan on April 5, 2012, he was chased by Jackson police officers Scott Goings ("Goings") and Steven Scarpino ("Scarpino"), that Scarpino tased him, causing him to fall and fracture his upper jaw and nose, and that this conduct amounted to excessive force in violation of his Fourth and Fourteenth Amendment rights. [*Id.*]. Siner also asserts that these officers falsely testified that in connection with his arrest for narcotics distribution, he was driving under the influence and pushed Scarpino, resulting in additional charges of obstructing a police officer and resisting arrest; the additional charges allegedly resulted in a higher sentencing guideline and a greater sentence on the drug charge, in violation of his Fourth, Sixth, and Fourteenth Amendment rights. [1 at *Statement of Facts*, 1-3]. Siner seeks $500,000 in compensatory damages. [1 at §IV *Relief*]. In his amended complaint, Siner requests unstated damages for emotional distress and physical injuries, $350.00 in compensation for his filing fee, punitive damages, and attorney's fees should he retain an attorney. [27 at *Statement of Claims* §A *Legal Relief*].

Defendants filed a motion for summary judgment, arguing that Goings and Scarpino are entitled to qualified immunity, that the Jackson Police Department is not a legal entity capable of being sued, and that Siner's allegations of perjury are not cognizable under 42 U.S.C. § 1983. [20]. Siner filed a response to this motion [22] in which he alleged that he "was tasered without any verbal warning or lawful command with a reasonable chance to comply." [22 at 5]. He also alleged, for the first time, that, he had "stopped fleeing when he was tasered," and that Goings and Scarpino violated his Fourth Amendment rights by participating in a malicious prosecution. [22 at 2, 14-22]. Defendants filed a reply [24]. Without receiving leave of court, Siner filed a

surreply which did not allege any new causes of action. [25]. Siner next moved to file an amended complaint in which he re-stated his allegations of malicious prosecution, perjury, and excessive force. [26, 27]. Siner also filed an affidavit in support of his claims in which he attested to the course of events set forth in his amended complaint. [28]. Defendants then filed a response to Siner's motion to file an amended complaint in which they argued that his amendment was futile [32], and moved to strike Siner's surreply [33], and Siner responded to both filings. [34, 35].

### B.     Factual Background

Siner and Defendants dispute the course of events that led to his arrest. The Court will first set forth the events as described by Defendants, and will then note the ways in which Siner disputes that version of events. Fortunately, video tapes of the incident in question have been provided to the Court, and are also discussed below.

On April 5, 2012, the Jackson City Police Department received a call from a homeowner in Jackson, Michigan, near First Street and Colfax Street; the homeowner complained of someone pulling into and out of their driveway repeatedly, and knocking on the homeowner's door. [20 Ex. B, Preliminary Examination in 12th District Court for the County of Jackson, testimony of Goings at 6-7 ("Goings' testimony")]. Goings arrived on the scene, followed thereafter by Scarpino. [*Id*. at 9]. The officers approached Siner's vehicle, where they found him asleep and the vehicle running. [*Id*. at 8-9]. The officers woke Siner, who allegedly spoke in a manner that was slurred and difficult to comprehend. [*Id*. at 10]. They assert that Siner seemed disoriented, and seemed to believe that he was in Detroit. [*Id*. at 9]. The officers saw a blood sugar testing kit in Siner's vehicle, and asked him to check his blood sugar, which he attempted to perform on the trunk of his vehicle. [Goings' testimony at 10-11]. Defendants

allege that Scarpino then saw a bag filled with a white substance sticking out of Siner's pocket, and directed Goings to "cuff him." [*Id*. at 12]. They assert that Siner immediately lunged towards Scarpino, then away from the officers, and attempted to escape on foot. [*Id*. at 12-13]. They further claim that Scarpino yelled the word "taser" twice during the chase, then deployed that device, which struck Siner. [20 at 3]. Siner fell and suffered a fracture to his upper jaw and nose upon striking the ground. [1 at 3]. Siner was thereafter taken into custody. [20 at 6].

Siner's version of events differs significantly. He alleges that he was not under the influence of narcotics at the time of arrest, but rather was merely tired after a day of driving and was napping as he waited for some friends to arrive. [22 at 4]. He asserts that he was neither confused nor disoriented. [*Id*.]. Siner recognizes that he was found with narcotics, but alleges that "neither officer observed the bag initially, until after [he] was tasered." [*Id*. at 5]. However, Siner also inconsistently argues that "the bag was never fully retrieved from plaintiff's pocket before falling to the ground when plaintiff began to flee." [25 at 3].

Siner states that he did not push or lunge at either officer, but admits that he attempted to flee. [22 at 5]. He further claims that the chase ended not because he was tased, but rather because he "ended his own attempted [sic] to flee, by stopping and raising his hands up, when he was tased in the back." [*Id*.]. Siner denies that either officer yelled the word "taser," though he paradoxically recognizes in the same paragraph that one of the officers can be heard yelling "taser" in a video recording of the incident. [*Id*. at 8]. He further asserts that the word "taser" was yelled simultaneously with the deployment of the taser, thus he did not have time to comply with that implied command to stop. [*Id*.]. Siner alleges that he was "not under arrest until he began to run," but also asserts that the officers failed to give him notice that he was under arrest or was required to stop his flight before deploying the taser. [*Id*. at 10-11]. He also asserts that

4

"[a]t no point did Scarpino pull any drugs out of plaintiff's pocket, then show the drugs to Goings, then say cuff him as the officers alleged and testified to." [*Id*. at 11].[1]

Siner asserts that "[t]here was no probable cause to arrest [him] for driving while under the influence. Plaintiff was not acting incoherent as officers allege, plaintiff was completely cooperative with the officers . . . . Plaintiff was only incoherent after he was tased and fell on the concrete face first." [22 at 16-17]. Finally, Siner alleges that Scarpino and Goings falsified their police reports and lied under oath during his prosecution by falsely asserting that he pushed Scarpino and was driving under the influence. [1 at *Statement of Facts*, 1-2; *Statement of Claims*, 1-3].

### C. Standard of Review

Federal Rule of Civil Procedure 56 provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011). A fact is material if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party. *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v.*

---

[1] As discussed below, video evidence directly contradicts Siner's version of the salient facts.

*CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'" *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001), quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558, quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.*, quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560, citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004).

The United States Supreme Court has made clear that video evidence substantiating one party's version of events can serve as controlling evidence at the summary judgment stage. *Scott v. Harris*, 550 U.S. 372, 380–381 (2007). In *Scott*, the Court considered video evidence that came from a camera inside a police car, and allowed that evidence to resolve the parties' conflicting factual accounts. *Id.* at 380. The Court refused to accept the plaintiff's version of the events because they were directly contradicted by the video evidence. *Id.* The Court held that "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

Pursuant to Federal Rule of Civil Procedure 15(a)(2), a party may amend its complaint

by leave of the court, and leave to amend "shall be freely given when justice so requires." However, leave to amend should be denied where "the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Carson v. U.S. Office of Special Counsel*, 633 F.3d 487, 495 (6th Cir. 2011).

**D.     Analysis**

   *1.     Siner's Allegations*

Siner, who is acting *pro se*, has made various assertions throughout his court filings regarding the course of events on the night of his arrest and the corresponding liability of Scarpino and Goings. Given the Court's obligation to liberally construe *pro se* pleadings, *see Thomas v. Eby*, 481 F.3d 434, 437 (6th Cir. 2007), and in the interest of expediently evaluating Siner's claims, it will consider all of his allegations across his complaint, amended complaint, and various other filings simultaneously.[2] Because the Court finds that each of Siner's claims should be dismissed, it will also deny as moot Defendants' motion to strike Siner's unauthorized surreply [33] in a separate order. [38].

   *2.     Content of the Police Cruiser Videos*

Defendants have submitted to the Court two dashboard camera videos from the police cruisers driven by Goings and Scarpino. [20 Ex. A]. These videos, taken at two different angles, clearly show the nature of the incident between Goings, Scarpino, and Siner. Because these videos are competent evidence at the summary judgment stage, the Court may consider them to determine whether either side's description of the stop and arrest is "blatantly contradicted" by that objective evidence such that no reasonable jury could believe it. *Scott*, 550 U.S. at 380. The Court has intensively reviewed both videos, and details their contents below.

---

[2] For reasons explained in a separate order issued on today's date, the Court has granted Siner's motion to file an amended complaint [26]. [38].

The video evidence shows Siner asleep at the wheel of a running car. [20 Ex. B, Goings Video at 00:53 ("Goings Video")]. He was awakened by Goings and Scarpino, who asked him to exit the vehicle. [*Id*.]. Siner appears to be wearing a light colored sweatshirt. Siner spoke in an incoherent and almost unintelligible manner, but stated that he was "waiting on [his] cousin." [*Id*. at 00:54]. He stated that he intended to meet his cousin on Longview and Chalmers, which the officers noted are not streets in Jackson, Michigan. [*Id*.]. The officers informed him that he was in Jackson, not Detroit; Siner appeared surprised by that revelation, and made an unintelligible exclamation in response. [*Id*. at 00:53-00:55]. The officers inquired as to whether he had been drinking, to which Siner replied that he had taken his prescription medications for diabetes and high blood pressure, Tramadol and Norvasc. [*Id*. at 00:55-00:56]. Siner also told the officers that they could "tear this motherfucker up," apparently consenting to a search of his vehicle. [*Id*. at 00:55].

The officers inquired as to whether Siner had knocked on the doors of houses in the area, to which he replied that he had not. [Goings Video at 00:56]. The officers then asked where Siner began his night, given his professed intention to meet someone in Detroit. [*Id*. at 00:57]. He stated that he was coming from Detroit, and then ramblingly asked Goings whether he heard about "the people [who] got burned up in a fire about four weeks ago . . . in Pontiac . . . I mean Flint." [*Id*. at 00:57]. Scarpino then asked Siner to check his blood sugar using a testing kit found in the vehicle to "make sure you're okay." [*Id*.]. Siner fumbled with and dropped his testing kit. [*Id*. at 00:59-01:03]. Siner eventually succeeded in taking his blood sugar, which he stated was "OK". [*Id*. at 01:03].

The events following Siner's blood test are more visible from the perspective of Scarpino's dashboard camera. Siner can be seen again dropping his blood sugar testing kit,

8

going into the pushup position, and retrieving the lost kit. [20 Ex. B, Scarpino Video at 01:03:28 ("Scarpino Video")]. Siner then stood back up, revealing his left side jacket pocket to Scarpino; Scarpino appeared to notice something in or protruding from Siner's pocket, leaned his head in for a closer view while shining his light at Siner's pocket, and retrieved a white bag from Siner's pocket. [*Id*. at 01:03:39-01:03:46]. Scarpino then held the bag in his left hand, examined it and looked towards Goings. [*Id*. at 01:03:47]. Scarpino then directed Goings to "cuff him," at which point Siner immediately attempted to flee. [*Id*. at 01:03:48]. In beginning his flight, Siner's left arm can be seen moving towards Scarpino, shoving or attempting to shove Scarpino in his mid-torso. [*Id*. at 01:03:50]. Scarpino appears pushed off balance; he leaned forward and jumped a half step back to avoid falling over. [*Id*.].

     Siner then dodged right, running towards what appears to be the front lawn of a house. [Scarpino Video at 01:03:50]. Both officers immediately took chase; Goings appears to stumble, while Scarpino maintained pursuit. [Goings Video at 01:03:54]. Though the limited camera angles and positioning of Siner's car results in a less-than-perfect view of the chase, Scarpino can clearly be seen chasing Goings (first around the car to the left, then away from the car, and finally back towards the right), and Scarpino can be clearly heard yelling "Taser! Taser!" while the chase is still ongoing, *i.e.*, while both he and Siner are running. [Scarpino Video at 01:03:55-57]. Siner continues running, and Scarpino chasing after him, for approximately two more seconds, until they move off camera at 01:03:59. [*Id*.]. Running footsteps can be heard for another second, until approximately 01:04:00, when Siner can be simultaneously heard yelling in pain, presumably from the effect of Scarpino's taser. [*Id*.].

     Thus, approximately twelve seconds transpired between Scarpino directing Goings to arrest Siner, a foot chase in the dark of night, and Siner's capture upon being tasered. [Scarpino

Video at 01:03:48-01:04:00]. Only approximately one second transpired between Scarpino chasing Siner off screen at full speed and Siner's cry of pain.[3] [*Id.* at 01:03:59-01:04:00]. Thus, the evidence shows that Scarpino warned Siner that he intended to use his taser approximately five seconds before deploying that device, and an active chase continued up until the time Siner was tased. [*Id.* at 01:03:55-01:04:00].[4]

### 3. Defendants are Entitled to Qualified Immunity as to Siner's Fourth Amendment Excessive Force Claim

Defendants assert that Officers Scarpino and Goings are entitled to qualified immunity as to Siner's excessive force claim, and that that claim must be dismissed accordingly.

To hold an individual police officer liable for the use of excessive force in violation of the Fourth Amendment, a plaintiff must show that the officer: "(1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force." *Binay v. Bennedorf*, 601 F.3d 640, 650 (6th Cir.2010) (internal quotations and citations omitted). "As a general rule, mere presence at the scene of [the alleged constitutional violation], without a showing of direct responsibility for the action, will not subject an officer to liability." *Id.* Additionally, "[e]ach defendant's liability must be assessed individually based on his own actions." *Id.*

Determining whether there has been a Fourth Amendment violation by an individual officer requires consideration of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Shreve v. Jessamine County Fiscal*

---

[3] Some period of time, however brief, necessarily elapsed between the officer firing his taser and Siner being struck.

[4] The video evidence disproves Siner's assertion that he "was tasered without any verbal warning or lawful command with a reasonable chance to comply." [22 at 5].

*Court,* 453 F.3d 681, 687 (6th Cir. 2006) (citation omitted). Those factors are non-exhaustive. *Goodwin v. City of Painesville*, 2015 WL 1245400, at *4 (6th Cir. Mar. 19, 2015). "The Court should judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight.'" *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). The reasonableness of the use of force is not judged from the plaintiff's subjective perspective. *Goodrich v. Everett*, 193 Fed. Appx. 551, 555 (6th Cir. 2006) (citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)).

Under the doctrine of qualified immunity, governmental officials performing discretionary functions are shielded from civil liability unless their conduct violates a clearly established constitutional right. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is premised upon the avoidance of unnecessary burdens of litigation, and therefore the privilege is immunity from suit and not a mere defense to liability. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001). Determining the applicability of qualified immunity requires a two-step inquiry into whether the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *See Saucier*, 533 U.S. at 194, 201. In conducting this inquiry, the Court is "permitted to exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *see also Bishop v. Hackel*, 636 F.3d 757, 772 (6th Cir. 2011). With respect to the second prong of the test for qualified immunity, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation that he confronted." *Saucier*, 533 U.S. at 202.

Here, the Court may begin and end its inquiry at the first prong, because Siner's rights were not violated by the actions of Officers Scarpino or Goings. As described above, the dashboard camera videos from Scarpino and Goings' police cruisers clearly refute Siner's allegations. His claim that he did not act incoherently or give any indication of being under the influence of drugs is completely inconsistent with, and disproved by, the video. Siner weaved and appeared unsteady on his feet, repeatedly dropped his blood sugar testing kit, was unaware of his location, rambled incoherently about Flint, Pontiac, and Detroit, and spoke in a tone that was garbled to the point of incomprehensibility.

The videos also disprove Siner's allegations about more salient events. Whereas Siner asserts that "[a]t no point did Scarpino pull any drugs out of plaintiff's pocket, then show the drugs to Goings, then say cuff him as the officers alleged and testified to," [22, *Statement of Facts* at 5], the video evidence proves that the events unfolded just as asserted by the officers. Moreover, Siner clearly understood that he was being placed under arrest because the video shows (and Siner admits [28 at 2]) the he immediately started to flee *after* the drugs were discovered and Scarpino ordered him to be cuffed. And, whereas Siner asserts that he did not push either officer, the video shows him make a shoving motion towards Scarpino, resulting in that officer being pushed off balance. As the foot chase ensues, Scarpino[5] can be clearly heard yelling "taser" twice before deploying that device to stop Siner, again providing him with notice that he was under arrest, and giving him a chance to stop his flight if he chose to do so.

---

[5] Goings does not appear to actually engage in the foot chase after his initial fall, and for that reason (in addition to the others discussed herein), he cannot be liable for Scarpino's use of the taser against Siner. *Binay*, 601 F.3d at 650; *see also Horn by Parks v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir. 1994) ("[P]roximate causation is an essential element of a § 1983 claim for damages."); *Ellis v. City of Cleveland*, 883 F.2d 74 (6th Cir. 1989) ("If causation is not alleged or apparent, a plaintiff can not prevail as causation is always a necessary element of all § 1983 claims.").

Finally, Siner's assertion that he stopped running and put his hands up in surrender just before he was tased is also belied by the video evidence. Scarpino's dashboard camera footage clearly shows that officer engaged in a foot chase at full running speed, and only the final second of the chase transpired off camera. Even during that short one second of time, the foot chase can still clearly be heard until Siner cries out in pain from being tased. Siner's assertion that he went from a sprint (for about five seconds *after* Scarpino's shouts of "Taser") to a dead stop while simultaneously thrusting his hands into the air over the course of approximately one second is thus inconsistent with the video and audio evidence. The Court notes that Siner did not mention his purported surrender in his original complaint. Rather he raised that claim for the first time in his response to Defendants' motion for summary judgment, wherein Defendants amply demonstrated that police officers may deploy tasers to stop suspects who are actively evading arrest, as was Siner. [22 at *Statement of Facts*, 5; 20 at 8-22].

Having determined that the video evidence supports Defendants' recounting of events in every material respect (and disproves Siner's version), the Court must now ask whether the actions taken by Scarpino violated Siner's constitutionally protected rights.

The Sixth Circuit Court of Appeals has repeatedly found that officers are entitled to qualified immunity when they deploy tasers to apprehend suspects who are either fleeing arrest or are otherwise resisting arrest. *See Correa v. Simone*, 528 F. App'x 531, 535 (6th Cir. 2013) (noting that the Sixth Circuit has found that there is no clearly established constitutional right to be free from the use of a taser if the arrestee is actively resisting arrest, including fleeing); *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 497 (6th Cir. 2012) (noting that in every case where a plaintiff was not fleeing or resisting arrest, federal courts denied qualified immunity to officers who deployed tasers, and in every case where a plaintiff was fleeing, federal courts

13

found that qualified immunity was appropriate); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) ("If a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him."). Because Siner was resisting arrest by fleeing from police at the time he was tased, Scarpino did not violate a clearly established constitutional right by deploying the taser against him, and is therefore entitled to qualified immunity as to this charge.

Even if, contrary to the evidence, the Court was to find that Siner stopped his flight and surrendered with his hands in the air the split second before he was tased, Scarpino's decision to deploy his taser would not violate Siner's clearly established constitutional rights. Again, the Court notes that it must consider, among other factors, "whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest by flight." *Shreve,* 453 F.3d at 687. The Court must also "judge the lawfulness of the conduct from the 'perspective of a reasonable officer on the scene…'" *Morrison*, 583 F.3d at 401.

Particularly following an attempt to escape arrest, police officers may be reasonably cautious of a suspect's claimed intention to surrender. In *Dunn v. Matatall*, 549 F.3d 348, 354-55 (6th Cir. 2008), the Sixth Circuit Court of Appeals found that police officers did not violate a clearly established constitutional right by forcibly removing a suspect from his vehicle following a car chase, even though the suspect indicated compliance by putting his hands out of the vehicle, dropping his car keys on the ground, and stating "I'm coming, I'm coming." The court found that "only seconds elapsed" between the suspect removing his seatbelt and being dragged from the vehicle, and that the car chase produced "heightened suspicion and danger" such that the arresting officers acted in an objectively reasonable manner to contain whatever potential

14

threats the arrestee may have posed if he remained in the vehicle. *Id*. at 355. The court also held that "it was reasonable for the Officers to consider [the challenged] resistant," and quoted one of the arresting officers who stated that "at what point do we then trust this resistant person to suddenly say, okay, I give up." *Id*. *See also Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009) ("It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders . . . . But that principle depends critically on the fact that the suspect is indeed subdued. Here, [the arresting officer] had no idea how [the fleeing suspect] was going to behave once he was cornered. No law that we know of required [the arresting officer] to take [the suspect's] apparent surrender at face value, a split second after [the suspect] stopped running.").

    Here, consideration of the relevant factors establishes Scarpino's right to qualified immunity for his use of the taser against Siner. Siner was being arrested for a serious felony, possession of nearly 50 grams of heroin, and he demonstrated an extreme change in his behavior, going from a subdued interaction with the officers over a period of a few minutes, to bolting away from them and attempting to flee into the darkness of the night. The dashboard camera video clearly recorded the sound of the chase, including Siner's cry of pain after he was struck by Scarpino's taser, yet Siner cannot be heard uttering any phrase which might indicate his intention to surrender, such as "I give up," "I surrender," or even "stop." The video shows it was pitch black at the time of the chase, reducing the visibility of any physical motions which Siner may have used to announce his surrender. Finally, even if Siner did put his hands in the air as alleged, and even if Scarpino was able to see them, the video establishes that Scarpino still would have had only a fraction of a second to interpret that signal and react accordingly. As noted above, even if he failed to do so, under the circumstances described herein, Scarpino would not

15

have violated Siner's clearly established constitutional rights. *Dunn*, 549 F.3d at 354-55.

In sum, both Scarpino and Goings are entitled to qualified immunity on Siner's excessive force claim, as neither officer violated Siner's clearly established constitutional rights.

    4. *Siner's Fourteenth Amendment Claim Should be Dismissed*

Siner's argument that Officers Scarpino and Goings violated his Fourteenth Amendment rights by giving false testimony regarding his battery on Scarpino is also foreclosed by the police dashboard camera video evidence, which shows that Siner shoved towards Scarpino, causing him to be pushed away from Siner. Under Michigan law, even a slight push constitutes a battery. *See Meissner v. MacLaren*, No. 2:13-CV-12351, 2014 WL 2931399, at *16 (E.D. Mich. June 30, 2014) (quoting *People v. Connelley*, No. 261901, 2006 WL 1867223, at *2 (Mich. Ct. App. July 6, 2006) (*per curiam*)).

Siner's malicious prosecution claim also fails because he pled guilty to some of the charges lodged against him. In order to sustain a malicious prosecution claim, the underlying charges must have been resolved in the plaintiff's favor. *Heck v. Humphrey*, 512 U.S. 477, 484 (1994). The charge of assaulting a police officer, resisting arrest, or obstructing police was dropped *nolle prosequi* by the prosecution as a result of Siner's agreement to plead guilty to the charge of possession of a controlled substance. [32 at Ex. D]. "In order for a termination of proceedings to be favorable to the accused, the dismissal must be one-sided and not the result of any settlement or compromise." *Ohnemus v. Thompson*, No. 14-5155, 2014 WL 6844631, at *3 (6th Cir. Dec. 5, 2014). Thus Siner may not sustain a malicious prosecution claim on the basis of any of the three charges that were lodged against him in this case.

    5. *Siner's Sixth Amendment Claim Should be Dismissed*

With regard to Siner's allegations of perjury, the Supreme Court has held that all

testifying witnesses in judicial proceedings are immune from perjury charges with regard to their testimony, even if those witnesses are police officers. *Briscoe v. LaHue*, 460 U.S. 325, 341 (1983); *Moldowan v. City of Warren*, 578 F.3d 351, 390 (6th Cir. 2009) (applying *Briscoe*); *Morgan v. Lincoln Cnty., Tenn.*, No. 4:09-CV-81, 2010 WL 3222503, at *2 (E.D. Tenn. Aug. 16, 2010) ("The law is well settled that the use of perjured testimony fails to state a claim under § 1983 because all witnesses, including police officers and other governmental witnesses, are absolutely immune from liability based upon their testimony in judicial proceedings."). The Court further notes, as discussed above, that each of Siner's allegations of perjury are clearly contradicted by the video evidence, which shows that he appeared obviously intoxicated, shoved at Scarpino, was aware that he was under arrest at the time he took flight, and continued to flee until he was tased. Thus, he cannot point to any testimony by either Defendant that is false. Finally, Siner himself admitted under oath during his sentencing that he was under the influence of heroin at the time of arrest, stating "that's why I was slumped over in the car, because I was using the heroin." [1 Ex. D, at 17].

> 6. *Siner's Claims Against the Jackson Police Department Should be Dismissed*

Siner's allegations against the Jackson Police Department should similarly be dismissed. As Defendants correctly note, "a municipal police department is a creature of the municipality . . . . A suit against a city police department in Michigan is one against the city itself, because the city is the real party in interest." *Haverstick Enterprises, Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 992 (6th Cir. 1994) (citation omitted). However, even if Siner had properly named the city of Jackson as a defendant, his claim would be deficient. If no constitutional violation was committed by the municipality's officers, then a claim based on the officer's conduct fails as against the municipality as well. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)

(*per curiam*); *Scott*, 205 F.3d at 879.  Moreover, municipalities are only liable for their own conduct, and are not liable for every action of their officers on the basis of *respondeat superior*.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  Siner has not properly alleged the existence of a policy, custom, or practice implemented by Jackson which could form the basis for a *Monell* claim against that municipality.  *Id*.

### III. CONCLUSION

For the reasons set forth above, **IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment **[20]** be **GRANTED**.


Dated: March 27, 2015            s/David R. Grand
Ann Arbor, Michigan              DAVID R. GRAND
                                 United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 27, 2015.

                                                s/Eddrey O. Butts
                                                EDDREY O. BUTTS
                                                Case Manager